**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SHAHRAM SERESHT,<br><br>                  Plaintiff,<br><br>      v.<br><br>UNITED STATES OF AMERICA;<br>and DOES 1 to 10,<br><br>                Defendants. | Case No. 8:21-cv-01365-SPG-ADS<br><br>**POST TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

Plaintiff Shahram Seresht ("Plaintiff") filed a Complaint against Defendant United States of America ("Defendant") asserting a single cause of action for negligence under the Federal Tort Claims Act ("FTCA"). (ECF No. 1 ("Complaint")). From May 28 through May 31, 2024, and on June 6, 2024, the matter was tried before the Court without a jury. (ECF Nos. 99–102, 104). The Court received exhibits and testimony from Plaintiff, Steven Man, Buena Park Police Officer Bobby Colon, Dr. Dennis Cramer, Daniel Voss, Lindsay Knutson, and Dr. Brian Rudin. (ECF No. 107). On August 13, 2025, the parties submitted supplemental briefing on the issues of causation and damages. (ECF Nos. 121–122).

After considering the parties' briefs, (ECF Nos. 115, 117), the testimony of the witnesses at trial, the admitted evidence, the closing arguments of counsel, and the filings

-1-

in the record, the Court pursuant to Federal Rule of Civil Procedure 52(a)(1), makes the following Findings of Fact and Conclusions of Law.

## I.        FINDINGS OF FACT

The Court finds the relevant facts as follows.

### A.        March 21, 2019, Motor Vehicle Collision

1.        At all times relevant herein, Steven Man was employed as a Petty Officer First Class with the United States Navy, an agency of Defendant.  (ECF No. 108, Trial Transcript, Day 1 ("T1")[1] at 18).

2.        On March 21, 2019, Mr. Man was driving a government owned 2018 Ford Focus in the course and scope of his employment.  (ECF No. 94 ("Admitted Facts"); Trial Exhibit ("Ex.") 4).

3.        Shortly before 3:00 p.m., Mr. Man was driving approximately 35 miles per hour ("mph") northbound toward 8th Street on Western Avenue in Buena Park, California. (Admitted Facts; T1 at 23, 32; Ex. 4).

4.        At that time, Conrad Mehr had brought his vehicle to a full stop facing northbound on Western in anticipation of making a left turn onto 8th Avenue.  (T1 at 30, 32–33, 38; Ex. 4).  Estefanny Soria had brought her vehicle to a complete stop behind Mr. Mehr's vehicle as Mr. Mehr negotiated the left turn.  (*Id.*).

5.        Plaintiff, who was driving in a white Toyota Prius and, at the time, was working as an Uber driver carrying two passengers seated in the rear passenger seat of his vehicle, was traveling approximately 25 mph northbound on Western an unknown distance behind Ms. Soria.  (T1 at 25, 36–37, 48, 51–52; Ex. 4).  As Plaintiff approached the intersection of Western Avenue and Eighth about a car length behind Ms. Soria's vehicle, Plaintiff slowed his vehicle to almost a full stop behind Ms. Soria's vehicle.  (T1 at 25, 51–52; Ex. 4).

---

[1] The T1 transcript is from the afternoon session of the first day of trial on May 28, 2024. No official transcript has been filed for the morning session of the first day of trial.

6.      According to Mr. Man, at approximately 3:00 p.m., he was traveling approximately 35 mph northbound on Western Avenue at an unknown distance behind Plaintiff's vehicle, saw vehicles stopped in front of him on Western Avenue, hit the brakes and tried to stop, but could not stop in time. (T1 at 23, 25, 32). As a result, the front of Mr. Man's vehicle collided with the back of Plaintiff's Toyota Prius. (*Id.* at 25).

7.      Plaintiff did not see Mr. Man's vehicle approaching before the collision and did not brace for the impact. (*Id.* at 52). According to Plaintiff, at the time of the collision, he had his foot on the brake when suddenly he was thrown forward. (*Id.* at 52–53). Although he was wearing his seatbelt, Plaintiff testified that the force of the collision propelled Plaintiff into the steering wheel of his Prius, and each of Plaintiff's two back passengers were propelled forward into the back of Plaintiff's front seat. (T1 at 51; ECF No. 109, Trial Transcript, Day 2 ("T2") at 29).

8.      What Plaintiff described as the "severe impact" from Mr. Man's vehicle propelled Plaintiff's car forward into the rear of Ms. Soria's car, the force of which resulted in Ms. Soria's car being propelled forward into the rear of Mr. Mehr's car. (T1 at 28, 31–33, 57). In total, four cars were involved in the collision. (T1 at 31; Ex. 4). The collision occurred approximately 75 feet south of 8th Street on Western Avenue. (Ex. 4).

9.      According to Mr. Man, the airbags in Plaintiff's vehicle and the other vehicles involved in the collision did not deploy, and each of the four drivers was able to drive his or her vehicle after the collision to the side of the road. (T1 at 26–27); *see also* (*id*. at 38, 54–55).

10.     Approximately five to ten minutes after the collision, Officer Bobby Colon of the Buena Park Police Department responded to the scene, examined each of the four vehicles involved in the collision, and took statements from each driver of each vehicle. (*Id.* at 26, 28, 31–32, 36). According to Officer Colon, he observed that Mr. Man's vehicle sustained what Officer Colon described as "minor" front-end damage, Plaintiff's vehicle sustained minor front-end and rear-end damage, Ms. Soria's vehicle sustained minor front-end and rear-end damage, and Mr. Mehr's vehicle sustained minor rear-end damage. (*Id.*

-3-

at 32, 38). None of the vehicles required a tow truck to leave the scene of the collision, and no ambulances were called for any of the drivers. (*Id.* at 27, 38–39).

11. Based on the drivers' statements and Officer Colon's observations of the vehicles, Officer Colon determined that Mr. Man had violated California Vehicle Code Section 22350[2] and was at fault for the collision. (T1 at 33, 36). Officer Colon, however, made a discretionary decision not to issue a citation to Mr. Man. (*Id.* at 33).

12. Officer Colon testified that he asked each of the drivers and Plaintiff's two passengers if they were hurt during the collision. (*Id.* at 33–34). While at the scene of the collision, Plaintiff complained to Officer Colon of experiencing pain in his back and at the back of his head. (*Id.* at 34–35). Plaintiff's two passengers each complained of experiencing back pain. (*Id.* at 35).

**B. Plaintiff's Medical History**

13. During trial, Plaintiff, who is in his early 50s,[3] testified about his medical history before the collision. He stated that, in the past, he had experienced some anxiety he believes was due to having immigrated to the United States, had seen his primary care doctor for the anxiety, and had been prescribed medication, which he took periodically. (T1 at 49). Other than taking medication for anxiety, Plaintiff has never sought any professional psychiatric care from a therapist, counselor, or psychologist for his anxiety. (T2 at 36–38). Plaintiff also has been diagnosed with other medical conditions, which he manages with medication. (T1 at 49; T2 at 25).

14. Plaintiff has a history of smoking cigarettes. Plaintiff testified that he quit smoking from 2013 to 2020 but resumed smoking thereafter. (T1 at 50). According to a medical record dated February 15, 2023, from Optum, Plaintiff visited Plaintiff's primary

---

[2] Section 22350 provides, "No person shall drive a vehicle upon a highway at a speed greater than is reasonable or prudent having due regard for weather, visibility, the traffic on, and the surface and width of, the highway, and in no event at a speed which endangers the safety of persons or property." Cal. Veh. Code § 22350.
[3] *See* (Ex. 1087 (listing Plaintiff's date of birth)).

care doctor on that day and reported that Plaintiff was smoking approximately two to three cigarettes per day.  (Ex. 1087; T2 at 57, 59).

15.    As to neck and back pain, Plaintiff testified that, before the collision, he occasionally would experience neck pain if he "slept in a bad position," but he did not experience chronic or ongoing pain, and, if he moved his neck around, the pain would go away.  (T1 at 50).  Plaintiff testified that he had never sought medical treatment for any condition or pain in his lower back, had never injured his lower back, and had not experienced chronic back pain.  (T1 at 50–51, 90); *see also* (Trial Transcript, Day 4[4] ("T4") at 60).

16.    Plaintiff also testified that he generally enjoyed an active life with his family before the collision, playing soccer, running, and wrestling with his teenaged son, walking and hiking with his family, and working out in a gym with his wife several times a week.  (T1 at 43–45; T2 at 23).  Additionally, Plaintiff testified that he hosted large family gatherings and parties at his home.  (T1 at 46–47).

**C.    Plaintiff's Condition After the Collision and Medical Diagnoses**

17.    Plaintiff testified that, immediately after the collision, he felt "really confused" and his body felt "heavy."  (*Id.* at 55).  Within approximately one hour after the collision, Plaintiff, who was feeling pain in his entire back and particularly the top of his shoulders, the bottom of his neck, and his lower back in his tailbone area, went to Nellie Gail Urgent Care.  (T1 at 63–64; T2 at 44–45).  Using a translator, Plaintiff reported to the urgent care medical provider that he was experiencing pain in the areas of his cervical (neck) and lumbar (lower back) spine.  (T2 at 32–33, 35; Ex. 1086).

18.    The printed record of Plaintiff's visit provides, "[p]atient reports that the pain is located mostly in the left side of his neck . . . and does not tend to rotate anywhere else."  (Ex. 1086).  The record also provides, "patient complains of Lumbar back pain after the

---

[4] There is no docket number for this transcript because no official transcript has been filed for the fourth day of trial.  Further, the reference numbers for T4 are to the numbers that appear on the transcript itself.

injury, he does have a chronic history of Lumbar pain[, and] he feels like [the collision] exacerbated the injury." (*Id.*).

19.    The record provides that Plaintiff's back and neck presented with "[n]o obvious edema, no swelling, no erythema, no obvious deformity, [and] no marked temperature difference." (*Id.*).  Additionally, the record notes Plaintiff had mild tenderness in his neck, but it was "not severe over the cervical spinous processes," and Plaintiff's range of motion in his neck was full, but tender to rotational movement.  (*Id.*).  Regarding Plaintiff's back, the record reflects that Plaintiff's back was "[t]ender to palpitation" in certain areas and that Plaintiff's range of motion was "actually quite impressive for [his] age and prior comorbidities." (*Id.*).

20.    The medical provider at Nellie Gail Urgent Care diagnosed Plaintiff with so-called soft tissue injuries, consisting of a neck and back strain and pulled back muscle. (Ex. 1086; T2 at 34–35).  Specifically, the printed record provides as to Plaintiff's neck that Plaintiff suffered a "[s]train of tendon of head and neck . . . strain of muscle, fascia[,] and tendon at neck level."  As to Plaintiff's back, the record provides that Plaintiff experienced a "[p]ulled back muscle (disorder) . . . [, s]train of muscle, fascia, and tendon of lower back. . . ." (Ex. 1086).  The medical provider "strongly advised" Plaintiff to obtain a referral for physical therapy.  (*Id.*).

### D.    Plaintiff's Medical Treatments

21.    After his urgent care visit, Plaintiff continued to experience pain in his neck and back.   Plaintiff saw several physicians, including Dr. Anal Podolsky, a pain management physician, and Dr. Jeff Shadjareh at American Multispecialty Medical Clinic. (T1 at 66; T2 at 39–40, 69; T4 at 63–65).  Dr. Podolsky suggested that Plaintiff receive cervical and lumbar steroid epidural injections and physical therapy.  (T4 at 63–65).  Over a period of approximately six weeks, Plaintiff underwent pain management therapies, including heating pads, massages, electrical shocks, chiropractic treatment, and four epidural steroid injections to treat Plaintiff's pain.  (T1 at 66–67; T2 at 39–40, 69; T4 at

63–65).  These treatments temporarily alleviated Plaintiff's pain, but then the pain would return.  (T1 at 66; T2 at 72–73; T4 at 63–65).

22.   On May 3, 2019, a Magnetic Resonance Imaging ("MRI") study was taken of Plaintiff's cervical and lumbar spine.  (T4 at 64).  The radiology report provides, among the list of the radiologist's "impression" from Plaintiff's MRI, that Plaintiff sustained some "loss of anatomical lordosis" or, in other words, natural curvature of the spine "consistent with lumbar paraspinous muscle spasm," and "facet joint effusions" in Plaintiff's lumbar spine "which may reflect strain, inflammation, or facet joint syndrome."  *See* (Ex. 37).

23.   In December 2019, Dr. Shadjareh referred Plaintiff to orthopedic spinal surgeon Dr. Anthony Mork.  (T1 at 66, 68; T4 at 65).  Dr. Mork prescribed a total of four epidural steroid injections for Plaintiff—two in Plaintiff's lower back and two in his neck, which were administered by Dr. Mork's pain management physician, Dr. Larry Ding.  (T1 at 66–67, 69; T4 at 64–65).  According to Plaintiff, after receiving the injections, within about a week or two the pain in his neck and back returned.  (T1 at 67; T4 at 65).

24.   On December 19, 2019, Dr. Mork performed a discogram by sticking a needle into Plaintiff's disc and injecting dye to see if the dye would leak out, which would help Dr. Mork isolate the main source of Plaintiff's pain.  (Rough Transcript, Day 1 ("RT")[5] at 58–59).  From the discogram, Dr. Mork determined that Plaintiff's disc at L5-S1 was a pain generator source.  (*Id.* at 59).  Thereafter, Dr. Mork performed an endoscopic discectomy on Plaintiff's back at the lower back L5-S1 by making a very small incision, putting a small camera in the location, and removing fragments and what Plaintiff described as "gelatinous material" from a disc in Plaintiff's spine that Dr. Mork diagnosed may have been causing Plaintiff's pain.  (T1 at 69–70; T4 at 20; RT at 59–60).

25.   Plaintiff testified it took him three weeks to recover from the surgery, during which time he could not drive and was placed on strong medication.  (T1 at 71).  Although

---

[5] The RT transcript is from the morning session of the first day of trial on May 31, 2024. No official transcript has been filed for the morning session of the first day of trial.

he felt a little better after the procedure, the pain in Plaintiff's back gradually returned. (*Id.* at 71); *see also* (T4 at 79).

26.    Plaintiff testified he had Medi-Cal insurance at the time of the collision but did not use the insurance to pay for his treatments from his medical provider for pain management therapy, physical therapy, chiropractic care, the steroid injections, and the discography and discectomy surgeries. (T2 at 22–23, 86–88). Instead, Plaintiff signed lien contracts pursuant to which the providers who gave him medical care after the collision are to be paid based on liens they hold on his potential litigation recovery. (*Id.* at 86–88).

### E.    Plaintiff's Condition as of the Bench Trial

27.    During trial, Plaintiff testified that he was still experiencing pain in his neck that spread to the top of his shoulders and down into his arms, where he was experiencing tingling and numbness. (T1 at 71–73).[6] Plaintiff testified that he would take Tylenol and Ibuprofen, which decreased the pain, but the pain would never completely go away. (T1 at 71–73). Plaintiff also testified that he was experiencing fatigue, as well as pain in his lower back around his tailbone area, that the pain spread down into his legs and up into his back, and that sitting made the pain worse. (T1 at 72–74; T2 at 23–24).

28.    At the time of trial, Plaintiff worked as a driver for DoorDash and testified that, after about an hour and a half of driving, he would need to take breaks, put his feet

---

[6] Plaintiff acknowledged during cross-examination that approximately four months after the collision during his July 30, 2019, appointment with his primary care doctor at Optum Plaintiff reported to his primary care doctor that he had no back pain, neck pain, joint pain, extremity weakness, and numbness in his extremities. (T2 at 56–57); *see also* (Ex. 1107). Similarly, Optum medical notes dated February 3, 2021, and February 15, 2023, reflect no reports of back pain and joint pain, as well as no dizziness, extremity weakness, headache, and extremity numbness. (Exs. 1087, 1098). When asked about the February 3, 2021, and February 15, 2023, records, Plaintiff testified that the purposes of his visits to his primary care doctors were unrelated to his back and that he did not recall what questions were asked of him during his primary care visits and did not recall what information he provided for the records. (T2 at 74–78). Defendant did not call the individuals who authored the records to testify during the trial as to the accuracy of the records.

up, or walk around due to him experiencing back pain.  (T1 at 75).  Additionally, Plaintiff testified that the pain was negatively affecting his relationship with his family and friends because he was not as social anymore, lacked sexual desire for his wife, has more anxiety, and in 2020 started smoking again, but quit in 2023.  (*Id.* at 76–79; T2 at 85–86).  Plaintiff has not attended therapy for any of his relationship or intimacy issues with his family.  (T2 at 89).

### F.    Trial Expert Testimony

#### i.    Dr. Cramer

29.    Dr. Dennis Cramer, a board-certified neurosurgeon specializing in back surgery, conducted a physical examination of Plaintiff in 2021 and was called as an expert by Plaintiff during the trial.  Dr. Cramer testified that the majority of patients he treats have degenerative diseases of the spine, he performs an average of four to eight spinal surgeries a week, and he regularly reviews billing records and fees associated with those surgeries. (RT at 24–26).

30.    According to Dr. Cramer, on September 10, 2021, he conducted a physical examination of Plaintiff's neck, lower back, and extremities; obtained Plaintiff's medical history; reviewed Plaintiff's MRI images taken on May 3, 2019; and reviewed Plaintiff's treatment plans from other physicians.  (*Id.* at 29–31, 75).  He did not review Plaintiff's actual X-ray images taken at Nellie Gail Urgent Care after the collision but did review the radiology report of those images.  (*Id.* at 76–78).

31.    Dr. Cramer explained the steps he takes in making medical diagnoses, including obtaining a history of the patient's injuries and pain, conducting a physical examination and asking the patient what he or she is experiencing to help determine or localize the source of pain, reviewing imaging and determining whether the patient's subjective reports of pain correlate with any imaging studies, and creating a treatment plan. (*Id.* at 31–32).  Dr. Cramer testified that, during his physical examination of Plaintiff, Plaintiff complained of neck pain with numbness and tingling extending to his arms, as well as lower back pain with numbness and tingling extending to his legs.  (*Id.* at 30).

32.    From his examination of Plaintiff, Dr. Cramer opined that Plaintiff's subjective reports of pain in his neck and back were consistent with Dr. Cramer's review of the objective imaging evidence,[7] Plaintiff's disc pathology, Plaintiff's caliber of the facet joints, and Plaintiff's medical history. (*Id.* at 31, 50–52; T1 at 4). In particular, Dr. Cramer observed from his review of Plaintiff's MRI scans that Plaintiff had disc protrusions in his cervical spine (neck) at level C3/4, C4/5, and C5/6; disc protrusions in his lumbar spine (lower back) at L3/4, L4/5, and L5/S1; and certain "white streaks" in Plaintiff's facet joints that in Dr. Cramer's opinion were signs of inflammation and could correlate with Plaintiff's symptoms. (*Id.* at 37–38, 44–49, 83; Exs. 1077, 1081). Dr. Cramer also opined that the inflammation was consistent with Plaintiff having experienced some injury to Plaintiff's spine from the collision. (RT at 31, 50, 52; T1 at 4).

33.    Additionally, Dr. Cramer testified that Plaintiff's medical records before the collision did not indicate Plaintiff had received much, if any, treatment for his neck and back and that, if Plaintiff had experienced the same pain before and after the collision, it would have been reflected in Plaintiff's medical history. (RT at 52, 74). Moreover, Dr. Cramer opined that Plaintiff's continued symptoms and failure to improve over time and after extensive nonsurgical treatment, including the epidural spinal injections and surgery, were not consistent with Plaintiff simply having suffered neck and lower back strain from the collision, as was diagnosed by the medical provider at Nellie Gail Urgent Care on the date of the collision. (*Id.* at 53–57). Dr. Cramer opined, instead, that Plaintiff had experienced more than just a soft tissue injury from the impact of the collision. (*Id.* at 63, 85–86).

34.    On cross-examination, Dr. Cramer acknowledged that the disc protrusions in Plaintiff's cervical and lumbar spine, scoliosis or curvature of Plaintiff's upper spine, and facet arthropathy or facet joint syndrome he observed in the imaging were not caused by

---

[7] According to his testimony, Dr. Cramer was not provided with Plaintiff's actual X-ray images, only the report about the images. *See* (*id.* at 77).

the collision but, instead, by age-related or other degenerative changes to Plaintiff's spine. (*Id.* at 78–83). Further, Dr. Cramer acknowledged that age-related degeneration also could be the source of Plaintiff's neck and back pain and such age-related degeneration could lead to worsening of a person's pain over time and require physical therapy, chiropractic therapy, epidural injections, and discectomy. (*Id.* at 84–86). However, Dr. Cramer reiterated that he attributed the inflammation shown in Plaintiff's facet joints and Plaintiff's neck and back pain to the collision. (*Id.* at 84–85).

35. Dr. Cramer also testified that he was aware of Plaintiff's history of smoking and acknowledged that individuals who smoke have an acceleration of the natural deterioration of their spine. (*Id.* at 74–75). However, because Plaintiff was asymptomatic before the collision, Dr. Cramer opined that this deterioration would not cause Plaintiff's neck and back muscle pain, the numbness and tingling that extended to Plaintiff's arms and legs, and Plaintiff's loss of range of motion. (*Id.* at 54–55, 74–75).

36. As to the medical treatments Plaintiff had received for his pain, Dr. Cramer opined that, based on his observations of Plaintiff's MRI scans and the symptoms Plaintiff was experiencing, the physical therapy and epidural steroid injections Plaintiff had received were medically acceptable, within the standard of care, and "very reasonable." (*Id.* at 56, 63–64). Although Dr. Cramer thought that the approximately 50 chiropractic sessions Plaintiff received were "a little excessive," because the sessions appeared to be helping Plaintiff to tolerate his pain symptoms, Dr. Cramer opined the number was reasonable. (*Id.* at 62).

37. Additionally, Dr. Cramer opined that Dr. Mork performing a discography and then discectomy surgery on Plaintiff's lumbar spine, during which Dr. Mork removed disc fragments from Plaintiff's L5/S1 disc, was a less aggressive alternative to replacing or fusing Plaintiff's disc and was within the standard of care, even though Dr. Cramer would not typically recommend the discectomy in his practice. (*Id.* at 61). Dr. Cramer explained that there is room for subjectivity in discograms and that discograms are used infrequently. (T1 at 5). Because, however, removal of the disc fragments found during the discectomy

resulted in Plaintiff experiencing only temporary relief, Dr. Cramer opined that the pain was likely coming from Plaintiff's disc itself. (*Id.* at 59–60).

38. As to Plaintiff's need for future medical treatments, Dr. Cramer testified that, based on the pain Plaintiff expressed he was experiencing at the time of the exam in 2021, Plaintiff could be a candidate in the future for cervical fusion at three levels and lumbar fusion at two levels if Plaintiff's pain was "ongoing and unrelenting and unbearable." (*Id.* at 32–33). Dr. Cramer testified that, if Plaintiff continued to experience severe pain, Plaintiff should first undergo short sessions of therapy and, if Plaintiff's pain did not improve, Plaintiff should get updated imaging studies, and then possibly discuss a more definitive surgery, such as a three-level fusion of his cervical spine at C3/4 through C5/6 and a two-level fusion of his lumbar spine at L4/5 and L5/S1 at a cost of approximately $150,000 for each surgery. (*Id.* at 69–73). Dr. Cramer testified, however, that he had not examined Plaintiff since his examination of Plaintiff in 2021. (*Id.* at 76).

39. During trial, Dr. Cramer provided his opinion regarding the costs of the medical services provided to Plaintiff. After reviewing Trial Exhibits 33-2 through 33-27, which list the total cost of Plaintiff's medical procedures after the collision, Dr. Cramer opined that the charges imposed on Plaintiff for the medical procedures on his back and neck were reasonable. (RT at 67; Exs. 33-2–33-27).

40. As to the basis for his opinion, Dr. Cramer testified that most of the patients that are being treated through a lien arrangement who are referred to him for a second opinion have billing information in their medical records and that he always takes note of those records to know what other surgeons are charging in the community. (RT at 30–31, 64–67). Dr. Cramer also testified that he treats patients involved in car accidents and has conversations with a colleague about the amounts his colleague typically charges for medical services. (*Id.* at 30–31, 66–67). Dr. Cramer noted, however, that he does not often review medical bills because he does not perform a lot of expert legal work. (*Id.* at 28).

41. Dr. Cramer also reviewed the report of Defendant's retained billing expert, Lindsey Knutson, and testified that he did not have any issues with the methodology she used in calculating the reasonable value of the medical expenses provided to Plaintiff. (T1 at 7).

ii. Dr. Brian D. Rudin

42. Defendant retained as its expert Dr. Brian D. Rudin, a board-certified orthopedic spine surgeon. Dr. Rudin testified that he conducted an Independent Medical Evaluation ("IME") of Plaintiff on July 31, 2023; reviewed Plaintiff's medical records, including the MRIs taken of Plaintiff's cervical and lumbar spine on May 3, 2019; and reviewed deposition testimony of Plaintiff and Dr. Cramer, as well as Dr. Cramer's medical reports regarding Plaintiff. (T4 at 2, 4–5).

43. During the IME, Dr. Rudin, with the assistance of a Farsi language interpreter, obtained from Plaintiff his medical history and symptoms. (*Id.* at 5–6). From Dr. Rudin's IME of Plaintiff and review of Plaintiff's medical records, Dr. Rudin opined that Plaintiff had some preexisting degenerative disc disease, in other words, "basically wear and tear of his neck and his low back," as well as a previous history of neck pain and back pain. (*Id.* at 6). Contrary to Dr. Cramer's opinion, Dr. Rudin opined that the motor vehicle collision merely caused a soft tissue strain of Plaintiff's cervical and lumbar spine. (*Id.* at 6).

44. Dr. Rudin explained that a degenerative condition is chronic wear and tear that people will experience to some degree by the age of 40 or 50, whereas acute trauma would involve disruption of the tissue, like a tearing, herniation, fracture, or other structural change as the result of an acute or sudden incident. (*Id.* at 6–7).

45. Dr. Rudin determined from his examination of Plaintiff's neck and cervical spine that Plaintiff had a bit of stiffness and loss of range of motion, which is typical of degenerative disc disease, but Plaintiff's strength and reflexes were normal. (*Id.* at 7–8). During Dr. Rudin's examination of Plaintiff, Plaintiff complained of numbness in his upper extremities radiating to his left shoulder and down his right arm in several different nerve areas, as well as tingling in his right hand. (*Id.* at 7–8, 54–55). Plaintiff also complained

of lower back pain in his lumbar spine and lower extremities, as well as numbness in his left leg in several different nerve areas. (*Id.*) Dr. Rudin found Plaintiff's complaints of numbness to be unusual because Plaintiff also exhibited normal strength and reflexes. (*Id.* at 7–8, 12–13).

46. Dr. Rudin testified that, typically, when someone injures a disc or has a nerve problem, the pain and numbness is limited to one or two nerve areas, not the four nerve areas in both Plaintiff's upper and lower extremities that Plaintiff was describing. (*Id.* at 7–8). Further, according to Dr. Rudin, Plaintiff's MRIs showed hardly any nerve compression, which, if present, might have potentially explained Plaintiff's pain and numbness in the areas about which Plaintiff complained. (*Id.* at 8, 12–13). Importantly, however, Dr. Rudin also concluded that Plaintiff was not malingering or exaggerating his symptoms. (*Id.* at 56).

47. Dr. Rudin testified based on the IME and the MRI of Plaintiff's cervical spine around Plaintiff's neck area that the cause of Plaintiff's pain in that area is the degenerative discs located in that area combined with bone spurs at the C3-C4, C5-C6, and C6-C7 levels of Plaintiff's cervical spine. (*Id.* at 27–28, 36; Exs. 1072, 1075). Dr. Rudin further opined that Plaintiff's complaints of numbness and tingling down his arm were due to radiculopathy, especially in the C5-C6 area. (T4 at 36). Dr. Rudin testified that there was no evidence in that spinal area of acute trauma or inflammation. (*Id.* at 29).

48. Additionally, Dr. Rudin testified that he palpitated Plaintiff's thoracic spine, a section of the spine that sits in the middle of the back between the cervical spine (neck) and the lumbar spine (lower back). (*Id.* at 9). Plaintiff complained of tenderness at the very top of his thoracic spine, as well as at the junction between the thoracic and lumbar spine. (*Id.*). Dr. Rudin opined that the pain Plaintiff complained of in his thoracic spine was not related to the bottom of the lumbar spine, which is in an area approximately eight inches below the thoracic spine and where Plaintiff had received medical treatments, including epidural injections. (*Id.* at 9–10). Instead, Dr. Rudin concluded from the reports of Plaintiff's X-rays from Nellie Gail Urgent Care, Plaintiff's MRI, and Dr. Rudin's IME

that the pain in Plaintiff's thoracic spine could be attributed to what Dr. Rudin determined was Plaintiff's pre-existing condition of having a small curvature of the spine or scoliosis because Dr. Rudin observed no disc injury or arthritis at that level. (*Id.* at 10–11, 33–34, 77). Dr. Rudin testified that the X-ray reports confirmed what he observed from Plaintiff's MRI, namely, that there is degenerative spurring from C5 to C7. (*Id.* at 33).

49. As to Plaintiff's lower back/lumbar spine, Dr. Rudin testified that, looking at imaging showing an axial cut of Plaintiff's L4-L5 disc, Plaintiff's complaints of sciatica or pain in his right buttock radiating down his leg are consistent with Plaintiff's MRI images showing arthritis in the L4-L5 disc area and that Plaintiff having an epidural injection in that area that had the effect of temporarily taking away the leg pain made sense. (*Id.* at 17–20, 22; Ex. 1079).

50. Overall, Dr. Rudin opined that Plaintiff's injuries from the collision were soft tissue injuries, like a cervical or lumbar strain, because there was no radiographic evidence showing injuries beyond that, and opined that there was no permanent change in Plaintiff's back and neck conditions due to the collision. (T4 at 34, 41). Dr. Rudin pointed out that Nellie Gail Urgent Care had made the same diagnosis of soft tissue strain. (*Id.* at 34). According to Dr. Rudin, Plaintiff's condition should have resolved on its own after about six weeks. (*Id.* at 41, 43).

51. From his review of Plaintiff's MRI scans, Dr. Rudin concluded that the images did not show evidence of an acute trauma to the spine. (*Id.* at 11). Instead, Dr. Rudin concluded that they showed "only chronic degenerative changes, in especially the cervical spine [(neck)], but to some degree, the lumbar spine, as well." (*Id.*); *see also* (*id.* at 11–16; Exs. 1081, 1084).

52. Additionally, Dr. Rudin opined that the upper back pain Plaintiff complained of during Dr. Rudin's examination was probably due to a small degree of scoliosis and that Plaintiff's lower back pain was due to arthritis at the L4-L5 disc area and facet joints that are slightly impinging on Plaintiff's spinal canal. (T4 at 35, 40, 77). Dr. Rudin opined that Plaintiff's sciatica or radiculopathy/sciatica in Plaintiff's lower back, as evidenced by pain

-15-

in Plaintiff's buttock and numbness in his right leg, was also due to the L4-L5 impingement on Plaintiff's right side caused by arthritis. (*Id.* at 36, 40–41). Dr. Rudin testified that his opinion is supported by the fact that the epidural that Plaintiff had previously received in his L4-L5 gave Plaintiff temporary relief. (*Id.* at 19, 35).

53.   Contrary to Dr. Cramer's conclusion that the "white stripes" shown by the MRIs in the facet joints indicate inflammation in those areas, Dr. Rudin testified on direct examination that the "white stripes" indicated normal joint fluid. (*Id.* at 18–19). Dr. Rudin explained that joint fluid lubricates the joints and provides nutrients to the cells of the joints. (*Id.* at 17). On cross-examination, when asked if he was aware that the radiologist reported that the facet joints in Plaintiff's lumbar spine showed inflammation, Dr. Rudin disagreed stating that the report indicated extra joint fluid. (*Id.* at 80–81). On re-direct, Dr. Rudin reiterated based on his interpretation of the MRI scans that they reflected normal facet joint fluid and that the MRI imaging and medical records did not show acute trauma or inflammation that would demonstrate aggravation of Plaintiff's spinal conditions. (*Id.* at 85). On re-cross, when defense counsel showed Dr. Rudin the radiologist report, Dr. Rudin acknowledged that the radiologist had concluded that Plaintiff had sustained some "loss of anatomical lordosis" or, in other words, natural curvature of the spine "consistent with lumbar paraspinous muscle spasm," and "facet joint effusions" in Plaintiff's lumbar spine "which may reflect strain, inflammation, or facet joint syndrome." *See* (T4 at 87; Ex. 37).

54.   As to treatment for Plaintiff's neck and back strain, Dr. Rudin testified that such soft tissue injuries would typically be treated conservatively with about six weeks of chiropractic physical therapy twice a week, up to twelve weeks of anti-inflammatory medication and, possibly, muscle relaxers. (T4 at 35). Dr. Rudin therefore opined that the treatment involving medications and chiropractic therapy was appropriate. (*Id.* at 6). As to the number of chiropractic treatments, Dr. Rudin characterized the number of treatments as "a little unusual," but reiterated that the treatment was appropriate. (*Id.* at 37).

55.   Dr. Rudin opined that the two epidural injections Plaintiff received in his cervical spine and two epidural injections that Plaintiff received in his lumbar spine were

-16-

not necessary as a result of the collision because there was no acute injury in those areas, just chronic wear and tear of the spine. (*Id.* at 38). Dr. Rudin explained that, if someone experienced a traumatic injury, like a herniated disc, their pain would be fairly consistent in the same location. (*Id.* at 38–39). Dr. Rudin testified that, by comparison, patients who have a chronic, degenerative condition would experience pain that waxed and waned with good days and bad days. (*Id.* at 39).

56. As to the discogram and discectomy, Dr. Rudin opined that they were not appropriate for treating the soft tissue strain of Plaintiff's cervical and lumbar spine. (*Id.* at 6, 11, 38). Dr. Rudin explained from his review of Plaintiff's medical records and MRI scans that Dr. Mork performed the endoscopic discectomy at Plaintiff's L5-S1 level by inserting an instrument into the disc in that area and removing disc material. (T4 at 20; Ex. 1081). Further, Dr. Rudin opined that he did not believe the discectomy was medically necessary and that he personally would not have performed the procedure on Plaintiff because Plaintiff's imaging did not show any disc injury or nerve compression that would warrant a discectomy, the source of Plaintiff's back and leg pain was largely from the L4-L5 area, and the only diagnostic test of the L5-S1 area was a discogram, which Dr. Rudin characterized as "very controversial at best." (T4 at 22, 38). Dr. Rudin acknowledged, however, that Plaintiff did receive some relief from his pain after performance of the procedures. (*Id.* at 79).

57. Dr. Rudin testified that the discogram procedure is considered experimental by some insurance companies, who will not cover it, and that the procedure is open to subjectivity. (*Id.* at 22). Further, Dr. Rudin testified that, in his practice, he would typically send a patient to an independent pain management physician for an evaluation and to obtain an independent assessment of whether a discectomy should be performed. (*Id.* at 23). Thus, Dr. Rudin found the fact that Dr. Mork performed both the discogram and discectomy to be unusual. (*Id.*).

58. As to Plaintiff's need for future medical care due to any injuries caused by the collision, Dr. Rudin testified that he did not recommend any future medical care for

Plaintiff because soft tissue strains like those experienced by Plaintiff typically resolve after six (6) to twelve (12) weeks. (*Id*. at 42–43). Further, Dr. Rudin testified that the chronic, age-related conditions (e.g., arthritis) that are causing Plaintiff's pain are not related to the March 19, 2019, collision. (*Id.*).

### iii. Lindsay Knutson

59. Defendant retained as its billing expert, Lindsay Knutson, a Director at Berkeley Research Group where she oversees data analytics and compliance audits for clients in the healthcare industry, including payers, providers, life science companies, and liability insurers. (Transcript Day 3, ECF No. 110 ("T3") at 10–11). Ms. Knutson testified that part of her work involves analyzing data to determine the reasonable value and appropriate reimbursement rates for various services, including physician, hospital, ambulatory, and physical therapy services. (*Id.* at 11). Ms. Knutson defined the phrase "reasonable value" as the average amount paid in the healthcare marketplace, based on the concept of a willing buyer and willing seller. (*Id.*).

60. As part of her analysis, Ms. Knutson looks at payment rates in comparison to provider charges. (*Id.* at 14). Ms. Knutson testified that the amounts charged by medical providers, such as hospitals, physicians, anesthesiologists, and ambulatory services centers, are not an appropriate measure of the reasonable value of healthcare services because those prices are unregulated and therefore "highly variable." (*Id.* at 13–15). Medical providers can unilaterally set their charges, and there is no relationship between amounts billed versus amounts paid. (*Id.*).

61. Instead, to determine the reasonable value for medical services, Ms. Knutson uses the Current Procedural Terminology ("CPT") codes the provider lists in the patient's bill for the service it provided, determines the geographical location where the services were provided based on the provider's zip code, then consults data collected and published annually by the Department of Health and Human Services ("HHS") to determine the benchmark rate Medicare pays for those same services, adjusted by geographic location. (*Id.* at 16, 21–22; Ex. 1047). Then, to arrive at the reasonable value for the services, Ms.

Knutson multiplies the HHS benchmark rate by a multiplier of 164.82, which reflects the percentage of costs above the HHS benchmark rate that researchers at the RAND Corporation determined California physicians, on average, are paid by commercial payers, such as insurance companies.  (T3 at 16, 18, 23–25, 31–32; Ex. 1047).

62.    Ms. Knutson, however, explained that she applies different multipliers for different categories of services, such as anesthesia and ambulatory surgery center services, to account for differences in billing reimbursement rates and, in the case of reimbursement for anesthesia services, consults a different study of reimbursement rates conducted by the American Society of Anesthesiologists ("ASA").  (T3 at 31–37).

63.    Ms. Knutson applied the same methodology to Plaintiff's medical service bills.  She reviewed the CPT codes contained in Plaintiff's bills for medical services that Plaintiff incurred, conducted a reasonable value analysis of the medical services received by Plaintiff based on the location where the service was provided to Plaintiff and HHS rates for that location, applied the applicable multiplier to that rate based on either the RAND or ASA studies where applicable, determined the reasonable value for each service, and prepared reports of her findings.  *See* (*id.* at 12, 31–37; Exs. 1047, 1048).  In doing so, Ms. Knutson, as a non-physician, did not provide an opinion regarding whether the services provided to Plaintiff were reasonably necessary from a medical perspective.  (T3 at 37).

64.    Based on her calculations, Ms. Knutson opined that the total reasonable value of the past medical services Plaintiff received after the March 21, 2019, collision from thirteen medical providers is $59,859.98, as compared to the total amount billed by those providers of $184,814.00.  (T3 at 18; Ex. 1048).

### G.    Credibility Determinations

65.    As to the circumstances of the collision and general description of the damage to the four vehicles involved, the Court finds Plaintiff, Mr. Man, and Officer Colon each provided competent, credible, and reliable testimony.  Although the government also elicited testimony from Daniel Voss as an accident reconstruction expert, Mr. Voss

testified that he did not inspect Plaintiff's vehicle, due to its unavailability, and was unable to calculate with certainty the distances between each vehicle before the collision. Moreover, the government failed to sufficiently demonstrate the relevance of Mr. Voss's testimony, given its limitations. The Court thus does not find Mr. Voss's expert testimony to be helpful in making its findings.

66. As to the extent of Plaintiff's claimed injuries, the Court credits Plaintiff's subjective complaints of pain in his neck and lower back in 2019 through at least 2021 as being caused by the collision. Immediately after the collision, although none of the airbags in any of the vehicles involved in the collision deployed and Office Colon described the damage to each vehicle as "minor," the impact of Mr. Man's vehicle hitting Plaintiff's vehicle was significant enough that it propelled Plaintiff's vehicle into the rear of Ms. Soria's car and Ms. Soria's car into the rear of Mr. Mehr's car. (T1 at 26–28, 31–33, 38, 57). Additionally, after the collision and while still at the scene, Plaintiff reported to Officer Colon that Plaintiff was experiencing pain in his back and at the back of his head, (*id.* at 34–35), and Plaintiff's two passengers each complained of experiencing back pain, (*id.* at 35).

67. Further, Plaintiff's X-rays from Nellie Gail Urgent Care and the diagnosis from doctors at Nellie Gail Urgent Care reveal, at a minimum, that Plaintiff suffered soft tissue injuries. *See* (Ex. 1086 (diagnosing Plaintiff's "[s]train of tendon of head and neck . . . [s]train of muscle, fascia[,] and tendon at neck level" and "[p]ulled back muscle (disorder) . . . [, s]train of muscle, fascia, and tendon of lower back. . . .")); *see also* (T2 at 34–35; T4 at 34; RT at 63, 85–86).

68. Although Nellie Gail Urgent Care's records from the day of the collision reported that Plaintiff had a "chronic history of lumbar pain," Plaintiff testified that he did not report to the Nellie Gail Urgent Care provider that he had a "chronic history" of back pain before the collision. (T2 at 34–35; Ex. 1086). Defendant also did not call as a witness during trial the individual who either spoke with Plaintiff and/or input the information from which the printed medical record was derived to verify the accuracy of the contents in the

record or the nature of the information Plaintiff had provided during his medical visit. Further, although Defendant admitted as an exhibit a printed medical record from Optum dated September 25, 2017, which suggests Plaintiff reported to the doctor treating his diabetes that he had numbness in his extremities, paresthesia, joint pain, muscle weakness, and neck pain, Defendant also did not call the individual who created the medical record to testify. (Ex. 1120; T4 at 44, 50–52). Moreover, Plaintiff denied during his testimony at trial having a history of cervical and lumbar pain before the March 21, 2019, collision. (T2 at 34). Plaintiff's testimony also tends to be corroborated by his medical records from his primary care doctor at Optum, which do not reflect either that his primary care doctor ever referred Plaintiff for imaging of his back or neck or that Plaintiff complained of "chronic" lumbar pain. (T4 at 53). Thus, although Plaintiff's MRI scans and testimony from the parties' medical experts indicate Plaintiff was experiencing degenerative age-related changes in his spine by the time of the collision, the Court credits Plaintiff's testimony, which is also corroborated by the testimony of Dr. Cramer, that any such pre-existing condition and pain was aggravated by the collision.

69.     On the issue of the extent of Plaintiff's injuries from the collision, both Drs. Cramer and Rudin provided testimony that was credible and reasonable, considering the evidence in the record. However, the Court finds that the testimony of Dr. Cramer regarding the extent of Plaintiff's injuries from the collision is more consistent with the weight of the evidence. Dr. Cramer conducted a physical examination of Plaintiff in 2021. Dr. Rudin, on the other hand, examined Plaintiff in 2023, approximately four years after the collision. By that time, Plaintiff reported to Dr. Rudin that Plaintiff was experiencing pain in his thoracic spine, which Dr. Rudin attributed to Plaintiff having a small degree of scoliosis. From his physical examination of Plaintiff, Dr. Rudin concluded that Plaintiff's strength and reflexes were normal.

70.     From his physical examination of Plaintiff in 2021, consideration of Plaintiff's subjective reports of pain, and review of Plaintiff's 2019 imaging and Plaintiff's medical history, Dr. Cramer opined that Plaintiff's subjective reports of pain in his neck and back

were consistent with the objective imaging evidence.  Dr. Cramer opined that certain "white streaks" shown in the scans of Plaintiff's facet joints indicated inflammation, which in turn indicated some injury.  *See* (RT at 31, 50–52; T1 at 4).  Dr. Cramer's observation regarding inflammation was corroborated by the radiologist report of Plaintiff's MRI scans in which the radiologist concluded that Plaintiff had sustained "facet joint effusions" in Plaintiff's lumbar spine, "which may reflect strain, inflammation, or facet joint syndrome." *See* (T4 at 87; Ex. 37).  Dr. Rudin dismissed the notion that Plaintiff's 2019 MRI scans showed signs of inflammation.  However, when shown the radiologist report on re-cross, Dr. Rudin, from the Court's observations of Dr. Rudin on the stand, appeared to acquiesce to the radiologist's findings, acknowledging that it is a radiologist's job to interpret radiology images more frequently than Dr. Rudin, and agreeing that reasonable practitioners could disagree about the same images.  (T4 at 87–88).

71.    Moreover, although both Drs. Cramer and Rudin agreed that Plaintiff's MRIs showed age-related disc degeneration and bone spurs in Plaintiff's cervical and lumbar spine, which could explain some of the pain Plaintiff was experiencing, the evidence in the record is sufficient to demonstrate by a preponderance of the evidence that the collision aggravated Plaintiff's condition and caused him to experience pain for a more prolonged period of time than what would be associated with simply a soft tissue strain.  *See* (T1 at 79–80, 83–84; T4 at 37, RT at 84–85; Ex. 37).

72.    Regarding the calculation of reasonable value, as between the testimony of Ms. Knutson and Dr. Cramer, the Court finds the opinions and methodology relied upon by Ms. Knutson to be more reliable and probative in determining the reasonable value of medical services received by Plaintiff for several reasons, including the following.

73.    First, Dr. Cramer does not appear to have extensive expertise in assessing the reasonable value of a variety of medical services.  He testified that, in his practice, he has access to billing records and will review bills from his own private practice, as well as bills from other surgeons when their patients seek a second opinion, and he consults with a colleague on what his colleague charges for medical services.  *See* (RT at 64–66).

Dr. Cramer also testified that he does not often review medical bills because he does not perform a lot of expert legal work. *See* (*id.* at 28). Additionally, Dr. Cramer did not present his methodology for calculating reasonable value. Nor did he specify the reasonable value of any specific bill or provide a total amount of the reasonable value of specific care received by Plaintiff that Dr. Cramer opined was reasonable. (*Id.* at 65–68).

74. By contrast, Ms. Knutson's professional services include analyzing data to determine the reasonable value and appropriate reimbursement rates for various medical services. Per her testimony, Ms. Knutson regularly analyzes payer, provider, and government financial data for health care services to assess the market rate for medical services and calculate a reasonable value for the services.

75. Second, Dr. Cramer's methodology in assessing reasonable value is not reliable. Dr. Cramer's opinions regarding reasonable value rely on the amounts billed by each of Plaintiff's medical providers and his general familiarity with such costs. His opinion is untethered to any particular market for Plaintiff's medical services. As discussed later in this opinion, however, simply relying on the full amounts billed is not an accurate measure of the reasonable value of the health care services provided, even when provided to an uninsured patient and based on a lien arrangement, because, among other issues, those rates can vary widely from provider to provider.

76. By contrast, Ms. Knutson testified that she arrives at her reasonable value figures by relying on several relevant data points, including by using the codes medical providers list in patients' bills for services provided; determining the geographical location where the services were provided; consulting data collected and published annually by HHS to determine the benchmark rate that Medicare pays for those services, adjusted by geographical location; and multiplying the benchmark rate by a multiplier to account for higher amounts paid by commercial payers.

77. The Court acknowledges, as argued by Plaintiff, that Ms. Knutson's methodology relies more heavily upon Medicare payment rates, is based on a fair market value that may not be precisely aligned with the relevant market in which Plaintiff received

his services, and relies on rates for its multiplier that have been negotiated by commercial payers that have more bargaining power than individuals, such as Plaintiff, who receive medical services pursuant to a lien arrangement. *See Madrigal v. United States*, Case No. CV 19-5041-RSWL-PLA, 2021 WL 3589328, at *4 (C.D. Cal. Aug. 13, 2021) (noting similar considerations in reviewing Ms. Knutson's methodology). Nevertheless, the Court finds for the reasons previously stated and discussed later in this opinion that Ms. Knutson's methodology more closely approximates the reasonable value for the medical services Plaintiff received than Dr. Cramer's methodology. In fact, in the case of the medical services Plaintiff received from Orange County Pain Clinic, the reasonable value calculated by Ms. Knutson is identical to the amounts billed for Plaintiff's treatment. Additionally, Dr. Cramer testified that he reviewed Ms. Knutson's report and did not have any issues with the methodology she used in calculating the reasonable value of the medical expenses provided to Plaintiff. *See* (T1 at 7). The Court will thus apply the reasonable value rates for Plaintiff's medical services that are based on the figures provided by Ms. Knutson.

## II.     CONCLUSIONS OF LAW[8]

### A.     Jurisdiction

78.     This is an action brought pursuant to the FTCA under 28 U.S.C. § 2675(a). *See* (ECF No. 48 ("FAC")). This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1346(b)(1).

### B.     Liability

79.     Plaintiff asserts a single claim for negligence under the FTCA alleging that Steven Man, an employee with the United States Navy, negligently operated his government vehicle in the course and scope of his employment resulting in Plaintiff's injuries. (FAC ¶¶ 8–9).

---

[8] Any findings of fact deemed to be a conclusion of law is hereby incorporated into the Conclusions of Law.

80.    The FTCA provides a broad waiver of the United States' sovereign immunity from suits by private citizens asserting claims arising in tort for the negligent or wrongful acts or omissions of federal employees while acting within the scope of their employment. *Lam v. United States*, 979 F.3d 665, 671–72 (9th Cir. 2020).  The United States can be held liable under the FTCA if a private person could be held liable to the suing party under the law of the state where the act or omission occurred.  *See* 28 U.S.C. § 1346(b)(1); *Lam*, 979 F.3d at 672.  Thus, cases brought under the FTCA are governed by the "law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).

81.    To establish a claim for negligence under California law, Plaintiff must demonstrate (1) a legal duty to use due care, (2) a breach of that legal duty, and (3) the breach as the proximate or legal cause of the resulting injury. *See Vasilenko v. Grace Family Church*, 404 P.3d 1196, 1198 (Cal. 2017).

i.    <u>Duty and Breach</u>

82.    The Court finds Plaintiff has met his burden of establishing by a preponderance of the evidence that the United States is liable on Plaintiff's negligence claim.  The evidence demonstrates Mr. Man had a duty to use ordinary care in the operation of his government vehicle.  Under California law, a driver has "a duty, both by statute and common law, to operate his vehicle without negligence so as to abstain from injuring any other person or his property." *Bewley v. Riggs*, 262 Cal. App. 2d 188, 194 (1968).  Drivers must also "control the speed and movement of their vehicles" and "[t]he failure to use reasonable care in driving a vehicle is negligence."  CACI 700.

83.    Under the negligence per se doctrine, a "violation of a statute gives rise to a presumption of negligence in the absence of justification or excuse," so long as the person who suffered the injury is within the class of persons for whose protection the statute was enacted. *Ramirez v. Nelson*, 44 Cal. 4th 908, 918 (2008).

84.    The Court finds Plaintiff has established by a preponderance of the evidence that Mr. Man breached his duty to use reasonable care when driving his government car toward the intersection of Western Avenue and 8th Avenue and failing to stop before

-25-

colliding with Plaintiff's car.  The Court thus finds that Mr. Man was negligent in breaching a duty owed to Plaintiff.

85.     Additionally, the Court finds Mr. Man violated California Vehicle Code Section 22350.  *See* Cal. Veh. Code § 22350 ("No person shall drive a vehicle upon a highway at a speed greater than is reasonable or prudent having due regard for weather, visibility, the traffic on, and the surface and width of, the highway, and in no event at a speed which endangers the safety of persons or property.").  Thus, Mr. Man was negligent per se.  *See Shehtanian v. Kenny*, 156 Cal. App. 2d 576, 579 (1958) ("[F]ailure to act within the standards fixed by the Vehicle Code is negligence per se"); *see also* Cal. Evid. Code § 669(a).  Mr. Man has not introduced any evidence to rebut the presumption of negligence.

86.     Moreover, because Mr. Man was acting within the scope of his employment at the time of the collision, Mr. Man's negligence is imputed to Defendant, and Defendant is liable for any damages proximately caused by Mr. Man.

### ii.   Causation

87.     To prove causation, Plaintiff bears the burden of proving by a preponderance of the evidence that Defendant's conduct was a substantial factor in bringing about the injury.  *See Leslie G. v. Perry & Assoc.*, 43 Cal. App. 4th 472, 481 (1996).  "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm.  It must be more than a remote or trivial factor.  It does not have to be the only cause of the harm."  CACI 430.  To be legally sufficient, evidence of causation must demonstrate that it was "more likely than not that the injury was a result of [the defendant's] action."  *Bowman v. Wyatt*, 186 Cal. App. 4th 286, 312 (2010) (quotation omitted).

88.     Based upon the temporal relationship between the collision and onset of pain, the opinions of Dr. Cramer and Dr. Rudin, who both agreed with the findings of the Nellie Gail Urgent Care provider that Plaintiff's soft tissue strain occurred as a result of the collision, (RT at 73–74; T1 at 12), Dr. Cramer's testimony that Plaintiff suffered

-26-

inflammation and experienced pain from the collision, and the Court's review of the evidence, the Court finds that Plaintiff has proven by a preponderance of the evidence that Mr. Man's negligence and aforementioned breach of duty were a substantial factor in causing both the collision and Plaintiff's neck and back injuries.[9]  Defendant has not shown that Plaintiff's actions on the day of the collision in any way contributed to the collision or Defendant's injuries.

89.  Additionally, although both Dr. Cramer and Dr. Rudin agreed that Plaintiff's MRI scans showed age-related wear-and-tear changes in his spine that are not related to the March 21, 2019, collision, Plaintiff's pre-existing conditions do not preclude his recovery.  Dr. Cramer testified that individuals experiencing degenerative changes in their spine are more susceptible to injuries because they have uneven pressure of the spine and are therefore less resilient to an "insult" to the body, even from a low impact injury.  (T1 at 8–9).  Thus, even if Plaintiff had age-related degenerative changes in his spine and the collision was minor based on Officer Colon's assessment that the collision caused "minor" damage to each vehicle, a preponderance of the evidence demonstrates Plaintiff pre-existing conditions, if any, were aggravated by the collision.  *See Sanchez v. Kern Emergency Medical Transportation Corp.*, 8 Cal. App. 5th 146, 168 (2017); *see also Rideau v. Los Angeles Transit Lines*, 124 Cal. App. 2d 466, 471 (1954) ("The tort feasor takes the person he injures as he finds him.  If, by reason of some preexisting condition, his victim is more susceptible to injury, the tort feasor is not thereby exonerated from liability.").

**C.  Damages**

i.  Past Economic Damages

90.  Plaintiff seeks damages for his past medical expenses, including the full amount his medical providers billed for the medical services he received.

91.  To recover damages for past medical expenses, a plaintiff must prove the "reasonable cost of reasonably necessary medical care" that he received.  CACI 3903A.  In

---

[9] Plaintiff is not seeking any damages for his vehicle.

-27-

other words, the plaintiff has the burden of showing that medical services were attributable to the injury caused by the defendant, that they were necessary, and that charges were reasonable. *Dimmick v. Alvarez*, 196 Cal. App. 2d 211, 216 (1961). "A plaintiff may recover as damages for past medical expenses no more than the reasonable value of the services provided." *Ochoa v. Dorado*, 228 Cal. App. 4th 120, 135 (2014) (citing *Howell v. Hamilton Meats & Provisions, Inc.*, 52 Cal. 4th 541, 555 (2011)). "[T]he measure of medical damages is the lesser of (1) the amount paid or incurred, and (2) the reasonable value of the medical services provided." *Bermudez v. Ciolek*, 237 Cal. App. 4th 1311, 1330 (2015). For plaintiffs who are uninsured and have incurred medical bills that they have not yet paid, the measure of damages "will usually turn on a wide-ranging inquiry into the reasonable value of medical services provided." *Id.* at 1330–31.

### a)   *Reasonably Necessary Medical Care*

92.   Plaintiff seeks to recover the full costs of his past medical services for his pain management, four steroid epidural injections, physical therapy, chiropractic care, discogram, and discectomy. As to the pain management services, physical therapy and chiropractic care, Dr. Rudin and Dr. Cramer both agreed that these medical services were attributable to the collision and were reasonably necessary. While both doctors testified that the number of chiropractic sessions exceeded the number typically required, they both indicated that the chiropractic treatment was still appropriate under the circumstances. *See, e.g.*, (T4 at 37).

93.   As to the epidural injections Plaintiff received in his neck and lower back, Drs. Cramer and Rudin disagreed regarding whether all the injections were reasonably necessary. Dr. Cramer testified that the steroid injections Plaintiff received were medically acceptable, within the standard of care, and reasonable. Dr. Rudin testified that the injections were not necessary, which was based on his opinion that Plaintiff had not sustained an acute disc injury, facet joint injury, or inflammation from the collision. As discussed previously, however, Dr. Rudin's opinion was contrary to the radiologist's report, and the Court credits the testimony of Dr. Cramer, which tends to be supported by

the radiologist's report, and which evidences that Plaintiff sustained some injury beyond just soft tissue strain.  The Court therefore finds by a preponderance of the evidence that the steroid injections were reasonably necessary.

94.    As to the discogram and discectomy, Dr. Rudin opined that the procedures were not reasonably necessary because Plaintiff did not sustain an acute injury to his discs, and Dr. Mork did not follow conventional medical protocols and/or industry standards in evaluating the need for, diagnosing, and undertaking the surgeries.  Dr. Cramer, however, opined that Dr. Mork performing a discography and then discectomy surgery on Plaintiff's lumbar spine was a less aggressive alternative to replacing or fusing Plaintiff's disc and was within the standard of care, even though Dr. Cramer would not typically recommend the discectomy in his practice.  (RT at 61).  Further, in undergoing the surgeries, the evidence in the record demonstrates that Plaintiff appeared to be following the advice of the medical experts known to him at the time and appeared to exercise due care when pursuing these medical treatments.  The Court thus finds Plaintiff may recover damages for the cost of these surgeries because they were both proximately caused by the collision and reasonably necessary.  *See Anaya v. Superior Court*, 78 Cal. App. 4th 971, 974 (2000).

### b)    Reasonable Value

95.    Regarding the reasonable value of the services Plaintiff received, as discussed previously, Plaintiff has not shown by a preponderance of the evidence that the billed amounts he incurred for his medical treatments are evidence of their reasonable value.  This is so because "there can be significant disparities between the amounts charged by medical providers and the costs of providing services," "the price of a particular service can vary tremendously . . . from hospital to hospital in California," and "a medical care provider's billed price for particular services is not necessarily representative of either the cost of providing those services or their market value."  *Ochoa*, 228 Cal. App. 4th at 135 (internal citations and quotation marks omitted).  Therefore, Plaintiff's mere proffer of the billed amounts he incurred is insufficient to demonstrate reasonable value.  Instead, "[l]ike insured plaintiffs, uninsured plaintiffs must introduce substantial evidence of both the

amount incurred and the reasonable value of the services." *Bermudez,* 237 Cal. App. 4th at 1337. Plaintiff has not presented such evidence.

96. The Court therefore awards past economic damages for the medical services Plaintiff has already incurred for his neck and back injuries in the total amount of $59,859.98.[10] This amount is based on the reasonable value for each medical service received by Plaintiff, as calculated by Ms. Knutson in Exhibit 1048 as follows:

| | |
|---|---|
| Orange County Pain Clinic | $14,150.00 |
| United Medical Imaging of Irvine | $1,125.10 |
| Crown Valley Outpatient Surgical Center | $19,036.60 |
| Anatol Podolsky, M.D. | $334.73 |
| Jason Johns, M.D. | $757.99 |
| Larry Ding, M.D. | $194.86 |
| Alan Mouchawar, M.D. | $550.89 |
| OC Physical Therapy | $1,528.20 |
| Anthony R. Mork, M.D. | $4,291.89 |
| Minimally Invasive Surgical Institute | $15,490.36 |
| John Hsieh, M.D. | $716.57 |
| Ajay Lalvani, M.D. | $1,180.95 |
| Dennis Cramer, M.D. | $501.85 |

---

[10] There is no evidence in the record that Plaintiff received any other medical services related to the collision other than what has been identified in Exhibit 1048.

ii.    Future Economic Damages

97.    Plaintiff seeks an award of future economic damages in the form of medical expenses based on the cost of two fusion surgeries in his neck and back that he asserts he will need in the future.  Plaintiff has not requested damages for any other type of future procedure or provided evidence showing the reasonable certainty of his need for any other procedure or its cost.

98.    A plaintiff is entitled to recover damages for medical care that he proves is reasonably necessary and he is reasonably certain to need in the future.  *Cuevas v. Contra Costa County*, 11 Cal. App. 5th 163, 183 (2017); CACI 3903A.  A plaintiff is not entitled to recover damages for future care that are speculative or merely possible.  *Cantu v. United States*, No. CV1400219MMMJCGX, 2015 WL 4720580, at *28 (C.D. Cal. Aug. 7, 2015) ("Future damages should not be awarded if they are speculative." (citing Cal. Civ. Code § 3283)); *see also Scognamillo v. Herrick*, 106 Cal. App. 4th 1139, 1151 (2003) ("Do not award a party speculative damages, which means compensation for future loss or harm which, although possible, is conjectural or not reasonably certain" (citation omitted))).  As with past medical expenses, a plaintiff can only recover the reasonable value of future medical care, and he bears the burden of submitting evidence that is sufficient to prove that reasonable value.

99.    Here, Plaintiff testified he is still experiencing some neck and back pain from the collision.  He therefore seeks an award of $300,000 in future economic damages, which Dr. Cramer testified is the cost of the two fusion surgeries Plaintiff argues he is "reasonably certain" to need in the future to treat his neck and back pain.  Plaintiff, however, has failed to establish by a preponderance of the evidence that the two fusion surgeries are reasonably necessary and that he is reasonably certain to need these surgeries in the future.

100.    Dr. Rudin opined that soft tissue strains like that experienced by Plaintiff typically resolve after six (6) to twelve (12) weeks and testified that he therefore did not recommend any future care for Plaintiff because of the March 19, 2019, collision.

101.   Dr. Cramer testified that, based on the pain Plaintiff was experiencing at the time of his medical examination in 2021, Plaintiff could be a candidate for surgery in the future.  However, Dr. Cramer qualified his opinion in several material respects.  First, he acknowledged that he had not examined Plaintiff since 2021 and therefore would need to update his diagnoses.  (RT at 76).  Second, he testified that surgery was a possibility if Plaintiff's pain was "ongoing and unrelenting and unbearable." (*Id.* at 31, 33).  Third, Dr. Cramer testified that Plaintiff would first need to pursue less drastic therapies to treat his pain before pursuing the surgeries.  Specifically, he opined, based on his evaluation of Plaintiff in 2021, that, if Plaintiff continued to experience severe pain, Plaintiff should first undergo short sessions of therapy and, if Plaintiff's pain did not improve, Plaintiff should get updated imaging studies, then possibly discuss a more definitive surgery.  (RT at 69–73).

102.   Although Plaintiff testified during trial that he was still experiencing some back pain since the collision, Plaintiff has not shown, nor did he testify during the trial, that his neck and back pain has risen to the level of being "ongoing and unrelenting and unbearable."  Nor has Plaintiff shown that he has pursued less drastic treatment since being examined by Dr. Cramer in 2021 with no success.  Indeed, the evidence in the record does not demonstrate that Plaintiff has obtained medical treatment for his neck and back pain beyond what is reflected in Trial Exhibit 1048.  In short, Plaintiff has not established based on the qualifications set by Dr. Cramer that the two fusion surgeries are reasonably necessary and his need for them is reasonably certain.  The Court therefore declines to award any amount for future economic damages.

### iii.   Non-Economic Damages

103.   Under California law, a plaintiff who has established a defendant's liability may recover noneconomic damages for harms, including emotional distress and pain and suffering. *Capelouto v. Kaiser Found. Hosps.*, 7 Cal. 3d 889, 892–93 (1972).  "For harm to body, feelings or reputation, compensatory damages reasonably proportioned to the intensity and duration of the harm can be awarded without proof of amount other than

evidence of the nature of the harm." *Duarte v. Zachariah*, 22 Cal. App. 4th 1652, 1664–65 (1994).

104. With respect to non-economic damages, there is no fixed standard for deciding the amount to award for pain and suffering. *See Pearl v. City of Los Angeles*, 36 Cal. App. 5th 475, 491 (2019) (internal citations omitted); *see also* CACI 3905A. However, any damages award for pain and suffering must be reasonable, based on the evidence and factfinder's common sense, and caused by the tort. CACI 3905A; *see also Duarte*, 22 Cal. App. 4th at 1665 ("The discretion of the judge . . . determines the amount of recovery, the only standard being such an amount as a reasonable person would estimate as fair compensation." (citation omitted)).

105. Here, Plaintiff has demonstrated that he has suffered some economic harm in the form of pain and suffering. He testified that, as a result of the March 21, 2019, collision, Plaintiff's involvement and interaction with his family has been detrimentally affected. For example, Plaintiff testified that, because he experiences fatigue, he is unable to hug, kiss, and say "I love you" to his son, picked fights with his daughter and developed a bad temper, and does not pay enough attention to his children. *See* (T1 at 76–77).

106. Defendant argues that Plaintiff is not entitled to noneconomic damages for his claimed anxiety and fatigue because Plaintiff experienced anxiety and fatigue before the collision, was already taking medication for his anxiety for several years before the collision, and by 2021 reported no anxiety and depression.

107. Although the Court finds as to anxiety and fatigue that there is sufficient evidence in the record to demonstrate that these issues existed to some degree before the collision, the Court also finds that these conditions worsened for a time due to the collision. The Court also finds that Plaintiff has demonstrated by a preponderance of the evidence that, as a result of the collision, he experienced pain, suffering, and impaired enjoyment of life for a period of time due to the collision. As such, the Court believes an award of $40,000 per year from the date of the collision to approximately 2023 for a total of $160,000 in noneconomic damages is reasonable, based on the evidence in this case, and

-33-

is not punitive.

### D. EAJA Fees

108.   Plaintiff has requested an award of attorneys' fees under the Equal Access to Justice Act ("EAJA").  Awarding fees under the EAJA in an FTCA case, however, can only be based on a finding of bad faith meriting litigation sanctions, and thus such an award "is punitive and should be imposed 'only in exceptional cases and for dominating reasons of justice.'"  *Rodriguez v. United States*, 542 F.3d 704, 711 (9th Cir. 2008) (citation omitted).  To sustain such a claim, Plaintiff has the burden to show that the United States "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Espinoza-Gutierrez v. Smith*, 94 F.3d 1270, 1279 (9th Cir. 1996) (citation omitted).

109.   The Court, however, finds that neither the underlying conduct that gave rise to Plaintiff's negligence claim nor the conduct of the attorneys in defending the litigation evidences "bad faith" that would warrant asserting a claim for attorneys' fees under the EAJA in an FTCA case.

110.   Insofar as Plaintiff has complained of being required to prove breach of duty at trial, the parties had stipulated prior to trial as to the relevant background facts of how the accident in question occurred.  *See* (Admitted Facts).

111.   The Court therefore denies the EAJA claim.

## III.   CONCLUSION

For the foregoing reasons, the Court finds Defendant liable and awards Plaintiff $219,859.98, consisting of $59,859.98 for Plaintiff's past medical expenses and $160,000 for Plaintiff's non-economic damages.

**IT IS SO ORDERED.**

DATED:   May 28, 2026

HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE

-34-